### IN THE UNITED STATES BANKRUPTCY COURT FOR
### THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 13-08171 EAG |
| PEDRO LÓPEZ MUÑOZ, | CHAPTER 11 |
| DEBTOR. | FILED & ENTERED ON 9/18/2018 |

### OPINION AND ORDER

Before the court is the confirmation of the debtor's proposed plan of reorganization and an objection to it filed by United Surety & Indemnity Company ("USIC"). The only requirement for confirmation that is in dispute here is whether the proposed plan meets the best-interest test of section 1129(a)(7)(A) of the Bankruptcy Code.[1] The court held an evidentiary hearing on this contested matter on April 2, 4, and 30, 2018. [Dkt. Nos. 515, 516, 520, 521, 538 & 539.] For the reasons stated below, the debtor's plan as supplemented [at Dkt. Nos. 126, 165, 222, 484, 498, 532 & 534] is confirmed and USIC's objection to confirmation [at Dkt. No 354] is denied.

### I. JURISDICTION

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), Local Civil Rule 83K(a), and the General Order of Referral of Title 11

---

[1]Unless otherwise indicated, the terms "Bankruptcy Code," "section"and "§" refer to title 11 of the United States Code, 11 U.S.C. §§ 1010-1532, as amended. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, and all references to "Rule" are to the Federal Rules of Civil Procedure. All references to "Local Bankruptcy Rule" are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico. And all references to "Local Civil Rule" are to the Local Rules of Civil Practice of the United States District Court for the District of Puerto Rico.

Proceedings to the United States Bankruptcy Court for the District of Puerto Rico, dated July 19, 1984 (Torruella, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. PROCEDURAL BACKGROUND[2]

On October 1, 2013, the debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  [Dkt. No. 1.] The debtor filed his schedules and statement of financial affairs together with the petition. [Id.]

On January 24, 2014, Banco Popular de Puerto Rico filed secured proof of claim number 6 in the amount of $3,061,547.16. [Claims Register No. 6-1.] On January 29, 2014, USIC filed unsecured proof of claim number 10 in the amount of $2,700,000.00.  [Claims Register No.10-2.]

On April 15, 2014, the debtor filed his first disclosure statement and plan of reorganization. [Dkt. Nos. 77 & 78.]  On July 17, 2014, USIC objected to the  disclosure statement and requested the appointment of a chapter 11 trustee. [Dkt. No. 103.]

On August 29, 2014, the debtor amended the disclosure statement and plan and opposed the request for a chapter 11 trustee.  [Dkt. Nos. 125, 126 & 127.] That same day, the debtor also amended the schedules, summary of schedules, and statement of financial affairs. [Dkt. Nos. 128 & 129.]

On October 28, 2014, USIC replied to the debtor's opposition to the request for a chapter 11 trustee. [Dkt. No. 156.]

---

[2] A more detailed procedural history is found in the court's opinion and order dated January 15, 2016. [Dkt. No. 312.]

On March 13, 2015, USIC filed a motion for summary judgment on the request for a chapter 11 trustee. [Dkt. No. 217.]   On March 17, 2015, the debtor filed an opposition. [Dkt. No. 219.]

On March 18, 2015, the debtor updated financial exhibits to the amended disclosure statement. [Dkt. No. 222.]

On April 16, 2015, the court entered an opinion and order denying USIC's motion for summary judgment. [Dkt. No. 231.]   On April 17, 2015, USIC moved for reconsideration of the order denying its motion for summary judgment.  [Dkt. No. 233.] The debtor opposed on April 20, 2015. [Dkt. No. 236.] On July 8, 2015, the court entered an opinion and order denying USIC's request for reconsideration. [Dkt. No. 254.]

The evidentiary hearing on USIC's request for a chapter 11 trustee was held on July 14 and 15, 2015. [Dkt. Nos. 259, 260 & 262.] After attending to post-hearing matters, the court issued an opinion and order on January 15, 2016 denying USIC's request for a chapter 11 trustee. [Dkt. No. 312.]

On January 29, 2016, USIC appealed to the United States Bankruptcy Appellate Panel for the First Circuit the opinion and order denying the request for a chapter 11 trustee. [Dkt. No. 315.]

On March 2, 2016, the court approved the debtor's amended disclosure statement at docket number 125, as supplemented at docket number 165. [Dkt. No. 337.]  The court also scheduled the hearing on confirmation for April 20, 2016. [Id.]

On March 8, 2016, while the appeal before the Bankruptcy Appellate Panel was pending, USIC moved this court to stay the proceedings. [Dkt. No. 340.]  On March 15, 2016,

the debtor opposed the request to stay proceedings. [Dkt. No. 345.]  The court held a hearing on March 23, 2016 where, after hearing argument by the parties, it denied USIC's request to stay the proceedings pending the appeal. [Dkt. Nos. 347 & 348.]

On April 1, 2016, Scotiabank filed an objection to the debtor's amended plan of reorganization.  [Dkt. No. 350.]   And, on April 7, 2016, USIC filed another objection to the amended plan. [Dkt. No. 354.]  On April 11, 2016, the debtor filed his section 1129 statement. [Dkt. No. 356.]

On April 14, 2016, the debtor filed a motion to inform that USIC had moved the Bankruptcy Appellate Panel to order the stay of the bankruptcy proceedings pending the resolution of the appeal. [Dkt. No. 358.] On April 14, 2016, USIC also moved this court to continue the hearing on confirmation set for April 20, 2016. [Dkt. No. 359.] On April 18, 2016, the Bankruptcy Appellate Panel issued an order staying all proceedings in this case, including the confirmation hearing set for April 20, 2016.  [Dkt. No. 361.]  This court then entered an order continuing sine die the confirmation hearing. [Dkt. No. 362.]

On July 28, 2016, the Bankruptcy Appellate Panel affirmed this court's decision denying USIC's motion for a chapter 11 trustee.  [Dkt. No. 375.]

On August 25, 2016, BPPR and Condado 2, LLC filed a notice of transfer of claim number 6.  [Dkt. No. 378.]

On September 2, 2016, this court set a status conference for September 15, 2016 to address confirmation-related issues. [Dkt. No. 380.]

On September 13, 2016, USIC appealed to the United States Court of Appeals for the First Circuit the decision of the Bankruptcy Appellate Panel affirming this court's denial of the

motion a chapter 11 trustee. [Dkt. No. 388.] On August 9, 2017, the Court of Appeals for the First Circuit issued an opinion and order affirming the decision of the Bankruptcy Appellate Panel. [Dkt. No. 432.]

This court then re-set the status conference on confirmation for November 30, 2017, but later continued it to December 7, 2017 at the request of the debtor. [Dkt. Nos. 442 & 444.] The court held the status conference on December 7, 2017, where it scheduled the confirmation hearing for March 7and 8, 2018.[3] [Dkt. Nos. 453 & 455.]

On February 20, 2018, the debtor again updated financial exhibits. [Dkt. No. 484.] On February 21, 2018, USIC's counsel requested the continuance of the confirmation hearing for health reasons. [Dkt. No. 485.] On February 21, 2018, the debtor and Scotiabank filed a stipulation to resolve Scotiabank's objection at docket number 350 to the amended plan. [Dkt. No. 487.] On February 22, 2018, the debtor supplemented his section 1129 statement and submitted additional ballots. [Dkt. No. 488.] On February 26, 2018, the court held a hearing on USIC's request to continue the confirmation hearing, and there rescheduled it to April 2 and 4, 2018. [Dkt. Nos. 495 & 496.] On March 21, 2018, the debtor updated his liquidation analysis. [Dkt. No. 498.] On March 28, 2018, the court approved the stipulation between the debtor and Scotiabank filed at docket number 487. [Dkt. No. 510.]

On April 2 and 4, 2018, the court held the confirmation hearing and scheduled a third hearing day for April 30, 2018. [Dkt. Nos. 515, 516, 520 & 521.] On April 9, 2018, the court scheduled for April 12, 2018 a telephonic, non-evidentiary hearing related to confirmation to

---

[3] At the hearing held on December 7, 2018, the court advised the parties that only a duly licenced appraiser could render an expert opinion as to the value of real property in a liquidation analysis. [Dkt. Nos. 453 & 455].

make preliminary findings and enter orders. [Dkt. No. 517.] A transcript of that hearing is at docket number 537. On April 26, 2018, the debtor and USIC submitted new liquidation analyses as requested by the court on April 12, 2018. [Dkt. Nos. 534 & 535.] After three days of testimony, the confirmation hearing concluded on April 30, 2018. [Dkt. Nos. 538 & 539.]

On May 14, 2018, the debtor and USIC submitted their respective proposed findings of fact and a memorandum of law limited as to trustee's fees in a chapter 7 liquidation case. [Dkt. Nos. 545 & 546.] On May 15, 2018, the debtor moved to strike portions of USIC's proposed findings of fact. [Dkt. No. 547.] USIC opposed the motion to strike on May 16, 2018. [Dkt. No. 548.] The court found that the motion to strike was unnecessary and would further delay a ruling on confirmation and, thus, denied it. [Dkt. No. 557.]

### III. CONFIRMATION HEARING

As mentioned, the confirmation hearing was held on April 2, 4, and 30, 2018. 2018. [Dkt Nos. 515, 516, 520, 521, 538 & 539.] During the hearing, the court heard testimony from five witnesses: appraiser Javier Ortiz del Valle (an expert witness for the debtor), CPA Doris Barroso (an expert witness for the debtor), debtor Pedro Lopez Muñoz (called by USIC), Jorge Vallejo Romeu (an expert witness for USIC), and CPA Rafael Perez Villarini ( an expert witness for USIC).

Appraiser Javier Ortiz del Valle testified on April 2, 2018 for the debtor. [Dkt Nos. 515 & 516.] CPA Doris Barroso testified for the debtor on April 4, 2018. [Dkt Nos. 520 & 521.] The debtor then made his section 1129 argument and submitted his case. [Id.] The hearing continued on April 4, 2018 with USIC calling debtor Pedro Lopez Muñoz, appraiser Jorge Vallejo Romeu, and CPA Rafael Perez Villarini. The hearing was then set to continue on April 30, 2018. [Id.]

But, on April 12, 2018, the court held a hearing by telephone to make preliminary findings and enter several orders related to confirmation. [Dkt. No. 517.] At that hearing, the court explained to the parties that there was a problem with the lumping of assets and liabilities in the debtor's liquidation analysis, which resulted in a misstatement of the liquidation value of the estate.  [Dkt. Nos. 519, 524 & 537.] The court also ordered USIC to submit a separate liquidation analysis using its own proposed discount factor. [Id.] In order to facilitate comparison of opposing liquidation analyses, the court directed the parties to follow a format of liquidation analysis found in case 15-09593 at docket number 74-4. [Id.]

The confirmation hearing then continued on April 30, 2018 where CPA Doris Barroso testified for the debtor as to the restated liquidation analysis.  Then CPA Rafael Perez Villarini testified for USIC and CPA Doris Barroso testified again in rebuttal. [Dkt. Nos. 538 & 539.]

**IV. FINDINGS OF FACTS**

The facts found by the court from the testimony of the witnesses at the evidentiary hearing, the documents entered into evidence,  and the post-hearing proposed findings of fact filed by the parties at docket numbers 545 and 546 are as follows:

***a. The debtor - Pedro Lopez Muñoz***

The debtor incorporated Hi-Speed Gas Corp. in 1999 to engage in the petroleum, gasoline, oil, and gas business. [Debtor's proposed findings of facts at Dkt. No. 545, ¶1; USIC's proposed findings of facts at Dkt. No. 546, ¶1.]  Hi Speed purchased a gas station located in Hormigueros, Puerto Rico. [Id.] The debtor owns 100% of the shares of Hi Speed. [Id.] The debtor in his personal capacity acquired in 2001 a gas station located in Mayaguez. [Debtor's proposed findings of facts at Dkt. No. 545, ¶2; USIC's proposed findings of facts at Dkt. No. 546,

¶2.] He operated it under the name of Speed Way Service Station a.k.a. Citgo Mayaguez (d/b/a). [Id.] Both gas stations are encumbered by mortgages currently held by Condado 2, LLC, (previously Banco Popular de Puerto Rico as per claim number 6). [Debtor's proposed findings of facts at Dkt. No. 545, ¶3; USIC's proposed findings of facts at Dkt. No. 546, ¶3.]

The debtor procured long-term leases for the Mayaguez and Hormigueros gas stations with Puma Energy Caribe LLC. [Debtor's proposed findings of facts at Dkt. No. 545, ¶4; USIC's proposed findings of facts at Dkt. No. 546, ¶4.] Both leases were signed on April 8, 2013, and recorded in the Property Registry in favor of Puma, commencing on April 8, 2013. [USIC's proposed findings of facts at Dkt. No. 546, ¶8.] The lease rent was $18,000 per month for 20 years for the Mayaguez gas station and $32,000 per month for 20 years for the Hormigueros gas station. [Id.] The monthly rent for both leases was adjusted down in order to recoup $125,000.00 pre-paid by Puma for each lease. [Debtor's proposed findings of facts at Dkt. No. 545, ¶5; USIC's proposed findings of facts at Dkt. No. 546, ¶5.] The adjusted monthly rent then became $17,479 for the Mayaguez Gas Station and $31,478 for the Hormigueros Gas Station. [Id.] The leases provide for a 3.5 % increase in monthly rent every four years. [Joint Exhibit III, Dkt. No. 520-5 at p.5.].

Banco Popular filed proof of claim number 6-1 in the total amount of $3,061,547.16. [Claims Register No. 6-1; Debtor's proposed findings of facts at Dkt. No. 545, ¶7; USIC's proposed findings of facts at Dkt. No. 546, ¶10.] Claim number 6-1 includes the following loans secured by the Mayaguez Gas Station: (i) loan #0548286-9007 in the amount of $1,185,187.08 and (ii) loan#0548226-9009 in the amount of $65,669.26, for a total secured claim of $1,250,856.00. [Id.] Claim number 6 also includes loan #0548286-9008 in the amount of

$1,810,690.82, which is secured by the Hormigueros gas station of Hi-Speed. [Debtor's proposed findings of facts at Dkt. No. 545, ¶8; USIC's proposed findings of facts at Dkt. No. 546, ¶11.] Loan #0548286-9008 is being paid by Hi-Speed under the original terms of the loan. [Id.]

### b. Valuation of the gas stations

The debtor retained the services of Mr. Javier Ortiz del Valle, a licensed professional appraiser, in order to obtain the market value of the fee simple rights of the real estate of the Mayaguez and Hormigueros gas stations. [Debtor's proposed findings of facts at Dkt. No. 545, ¶47; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt No. 515.] The appraisal reports were done under the hypothetical condition that the gas stations were closed or out of service, which is not the case. [Debtor's proposed findings of facts at Dkt. No. 545, ¶47;USIC's proposed findings of facts at Dkt. No. 546, ¶62 Testimony of Mr. Javier del Valle on April 2, 2018, Dkt No. 515.] Mr. Ortiz del Valle did not perform a leased fee interest analysis and did not consider the leases of the Mayaguez and Hormigueros gas stations in his appraisal reports. [USIC's proposed findings of facts at Dkt. No. 546, ¶¶57 & 68; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.]

Both reports identified Mrs. Del Valle and C. Conde & Associates Law Firm as the sole intended users of the appraisal reports to assist in a "decision-making process." [USIC's proposed findings of facts at Dkt. No. 546, ¶¶51-52 & 54; Debtor's Exhibit B, Appraisal Report for Mayaguez Gas Station, Dkt. No. 520-3; Debtor's Exhibit C, Appraisal Report for Hormigueros Gas Station, Dkt. No. 520-4.]

Mr. Ortiz del Valle testified that for purposes of the appraisal reports, he made a drive-by inspection of the properties and used the description of the improvements from prior appraisal reports of both properties not done by him. [Debtor's proposed findings of facts at Dkt. No. 545, ¶62; USIC's proposed findings of facts at Dkt. No. 546, ¶58; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.] The reports state that the appraisals were made using the extraordinary assumption that the physical condition of the interior of the properties is similar to the physical condition of the exterior. [Debtor's Exhibit B, Appraisal Report for Mayaguez Gas Station, Dkt. No. 520-3 at page 9; Debtor's Exhibit C, Appraisal Report for Hormigueros Gas Station, Dkt. No. 520-4 at page 10; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.] Mr. Ortiz del Valle testified that although he did not inspect the interiors for purposes of the appraisal reports, he went inside both gas stations. [Debtor's proposed findings of facts at Dkt. No. 545, ¶62; USIC's proposed findings of facts at Dkt. No. 546, ¶59; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.]

Mr. Ortiz del Valle concluded that the market value of the Mayaguez gas station was $230,000 as of February 2, 2018. [Debtor's proposed findings of facts at Dkt. No. 545, ¶48; Debtor's Exhibit B, Appraisal Report for Mayaguez Gas Station, Dkt. No. 520-3 at page 4.] The reported market value is based on an exposure period and marketing time of 36 months. [Debtor's proposed findings of facts at Dkt. No. 545, ¶49; Debtor's Exhibit B, Appraisal Report for Mayaguez Gas Station, Dkt. No. 520-3 at page 4.] Mr. Ortiz del Valle compared the property to other gas stations with similar qualities sold between 2013 to 2016, in order to arrive at the market value. [Debtor's proposed findings of facts at Dkt. No. 545, ¶49; Testimony of Mr. Javier

del Valle on April 2, 2018, Dkt. No. 515.] He compared the subject property to gas stations being sold to be reopened by the potential purchasers. [Id.]

Mr. Ortiz del Valle also concluded that the market value of the Hormigueros gas station was $700,000.00 as of February 2, 2018. [Debtor's proposed findings of facts at Dkt. No. 545, ¶51; Debtor's Exhibit C, Appraisal Report for Hormigueros Gas Station, Dkt. No. 520-4 at page 4.] The reported market value is also based on an exposure period and marketing time of 36 months. [Debtor's proposed findings of facts at Dkt. No. 545, ¶52; Debtor's Exhibit C, Appraisal Report for Hormigueros Gas Station, Dkt. No. 520-4 at page 4.] Mr. Ortiz del Valle compared the property to other gas stations with similar qualities sold between 2013 to 2016, in order to arrive at the market value. [Debtor's proposed findings of facts at Dkt. No. 545, ¶52; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.] Again, he compared the subject property to gas stations being sold to be reopened. [Id.]

Both appraisal reports assumed that the trend in Puerto Rico of declining market values of gas stations would continue, which required a negative adjustment to the value of the Mayaguez and Hormigueros gas stations. [Debtor's proposed findings of facts at Dkt. No. 545, ¶53; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.] Mr. Ortiz del Valle testified that since 2008 more than 400 gas stations have been closed in Puerto Rico. [Debtor's proposed findings of facts at Dkt. No. 545, ¶54; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.] This figure does not consider the impact of Hurricane Maria. [Id.]

Mr. Ortiz del Valle also testified that under a liquidation scenario, the values would be lower than those established as the market value due to the discount that needs to be provided

11

for a faster sale of the properties by a chapter 7 trustee. [Debtor's proposed findings of facts at Dkt. No. 545, ¶50; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.]

Both reports described the gas stations as improved, including the Puma leases, and disclosed that the reports were appraising only the fee simple rights. [Debtor's proposed findings of facts at Dkt. No. 545, ¶55; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.] Mr. Ortiz del Valle also testified that after the appraisal reports were issued, he analyzed comparable sales of operating gas stations. [Id.] He concluded from the analysis of the two gas stations that there was no need to change his opinion of value in this case. [Id.]

The use of a hypothetical condition in an appraisal prepared for legal purposes is allowed under Standard 1-2(g) of USPAP. [Id.; USIC's Exhibit 7, 2018-2019 Uniform Standards of Professional Appraisal Practice, Dkt. No. 520-6 at page 17.] Mr. Ortiz del Valle was asked about USPAP's Advisory Opinion 223 which provides for a scenario where an appraisal is made of the fee simple interest of a leased property. [Debtor's proposed findings of facts at Dkt. No. 545, ¶59; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.] He identified those parts of his reports where he made the disclosures regarding the hypothetical condition and that he was only appraising the fee simple interest of the properties. [Debtor's proposed findings of facts at Dkt. No. 545, ¶60; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515; USIC's Exhibit 7, 2018-2019 Uniform Standards of Professional Appraisal Practice, Dkt. No. 520-7 at page 285.] Mr. Ortiz del Valle testified that both reports complied with the prevailing Uniform Standards of Professional Appraisal Practice (USPAP) and the Advisory Opinions of the Appraisal Standard Board of the Appraisal Foundation. [Debtor's proposed

findings of facts at Dkt. No. 545, ¶57; Testimony of Mr. Javier del Valle on April 2, 2018, Dkt. No. 515.]

USIC called Mr. Jorge Vallejo, also a licensed appraiser, as its expert witness to rebut the testimony of Mr. Ortiz del Valle. [Dkt. No. 521.]  Mr. Vallejo testified that he neither rendered an opinion of value nor appraised the two gas stations. [Debtor's proposed findings of facts at Dkt. No. 545, ¶64; Testimony of Mr. Jorge Vallejo on April 4, 2018, Dkt. No. 516.] Mr. Vallejo also admitted that he did not visit the gas stations. [Id.] He limited his work to reviewing the appraisal reports prepared by Mr. Ortiz del Valle and providing his professional opinion of them. [Id.]  Mr. Vallejo gave his expert opinion as to the credibility, quality of work, and compliance with USPAP. [Debtor's proposed findings of facts at Dkt. No. 545, ¶65; Testimony of Mr. Jorge Vallejo on April 4, 2018, Dkt. No. 516.]

Mr. Vallejo admitted that USPAP allows the use of extraordinary assumptions and hypothetical conditions. [Debtor's proposed findings of facts at Dkt. No. 545, ¶70; Testimony of Mr. Jorge Vallejo on April 4, 2018, Dkt. No. 516.]  Mr. Vallejo also admitted that both reports identify the extraordinary assumptions and stated that if the assumptions were not true, the report was invalid. [Id.] He also testified that both reports stated the use of a hypothetical condition. [Debtor's proposed findings of facts at Dkt. No. 545, ¶70; Testimony of Mr. Jorge Vallejo on April 4, 2018, Dkt. No. 516.] Mr. Vallejo admitted that Advisory Opinion 223 allows an appraiser to perform a report of the "fee simple interest" of a leased property and does not require that the appraiser analyze the "leased fee interest" of the property. [Debtor's proposed findings of facts at Dkt. No. 545, ¶73; Testimony of Mr. Jorge Vallejo on April 4, 2018, Dkt. No. 516.]

Mr. Vallejo admitted that both appraisal reports were presented as evidence to assist the court in its legal analysis of the case and that Standard I-2(d) of USPAP allowed the use of hypothetical conditions by the debtor. [Debtor's proposed findings of facts at Dkt. No. 545, ¶71; Testimony of Mr. Jorge Vallejo on April 4, 2018, Dkt. No. 516.]

### c. Liquidation analyses

On April 4, 2018, CPA Doris Barroso, the debtor's expert witness and bankruptcy accountant testified again for the debtor. [Debtor's proposed findings of facts at Dkt. No. 545, ¶74; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516.] Ms. Barroso was in charge of the bankruptcy accounting in the case. [Id.] In that capacity, she reviewed and reconciled the debtor's monthly operating reports and the claims filed in the case. [Id.; USIC's proposed findings of facts at Dkt. No. 546, ¶82.] She also prepared the payment plan schedule, the cash flow statement, and the liquidation analysis submitted as exhibits to the disclosure statement and plan of reorganization. [Debtor's proposed findings of facts at Dkt. No. 545, ¶74; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516.] Ms. Barroso also updated the liquidation analysis for the confirmation hearing. [Dkt. No 498; Debtor's Exhibit E, Dkt. No. 521-4.]

Ms. Barroso testified that the debtor's plan would be funded by the debtor's salary, rental income, distributions or dividends received by Hi-Speed Gas Corp. and Puerto Rico International Salt, and the sale of the debtor's residence. [Debtor's proposed findings of facts at Dkt. No. 545, ¶75; USIC's proposed findings of facts at Dkt. No. 546, ¶83; Testimony of CPA Doris Barroso on April 4, 2018, Dkt No. 516.]

The debtor's plan provides for a 9% dividend to unsecured creditors. [Debtor's proposed findings of facts at Dkt. No. 545, ¶116; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Joint Exhibit IX, Dkt. No. 521-12.] By way of example, Ms. Barroso divided the total amount of $243,000 to be paid to USIC under the plan by the total amount of $2,700,000 of its claim to yield a dividend of 9%. [Debtor's proposed findings of facts at Dkt. No. 545, ¶¶117-118; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Joint Exhibit IX, Dkt. No. 521-12.]

Ms. Barroso prepared the liquidation analysis submitted with the disclosure statement. [Debtor's proposed findings of facts at Dkt. No. 545, ¶77; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3.] The liquidation analysis showed that in a chapter 7 liquidation scenario, there would be no dividend to general unsecured creditors. [Debtor's proposed findings of facts at Dkt. No. 545, ¶77; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Exhibit E, Dkt. No. 521-4.]

Ms. Barroso testified that the values assigned to the assets in that liquidation analysis were obtained from the debtor's schedules (for the real estate properties and other personal property), Rule 2015.3 reports (for the value of Puerto Rico International Salt) and computed values prepared by her for the intangibles (gas station with the Puma lease for Mayaguez and Hi-Speed shares). [Debtor's proposed findings of facts at Dkt. No. 545, ¶78; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.] When preparing the analysis, she did not have appraisal reports for any of the real estate properties. [USIC's proposed findings of facts at Dkt. No. 546, ¶85; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516.]

15

The assets included in the liquidation analysis are: cash; a parking lot in Méndez Vigo Street; an office building in Méndez Vigo Street; the debtor's residence; a lot of land joint; a gas station; household goods, furniture, jewelry, and apparel; 50% of the shares in P.R. International Salt Corp. and Western Petroleum; 100% of the shares in Hi-Speed; the Hi-Speed lease listed as gas station; and a boat (dingui). [Debtor's proposed findings of facts at Dkt. No. 545, ¶77; USIC's proposed findings of facts at Dkt. No. 546, ¶84; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.]

The estimated value of the Mayaguez gas station in the debtor's liquidation analysis was $1,2888,884, which was the same listed in his amended schedules. [Debtor's proposed findings of facts at Dkt. No. 545, ¶80; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.] Ms. Barroso included in the liquidation analysis, as a separate asset of the debtor, the net income derived from the lease of the Mayaguez gas station. [Debtor's proposed findings of facts at Dkt. No. 545, ¶82; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.] The value stated in the debtor's liquidation analysis for the Puma lease of the Mayaguez gas station was $150,000, which was calculated as the present value of the estimated future cash flows with a 24% discount rate. [Debtor's proposed findings of facts at Dkt. No. 545, ¶83; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.] Ms. Barroso then took 90% of that present value amount as the value of the Puma lease in a chapter 7 liquidation. [Debtor's proposed findings of facts at Dkt. No. 545, ¶85; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.]

The value given to the shares of Hi-Speed in the debtor's liquidation analysis was $122,000, which again was the present value of the estimated future cash flows under the Puma lease with a 24% discount rate. [Debtor's proposed findings of facts at Dkt. No. 545, ¶86; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.] Ms. Barroso estimated that the liquidation value of the income from the operation of the Hormigueros gas station at 90%. [Debtor's proposed findings of facts at Dkt. No. 545, ¶88; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.]

According to the debtor's liquidation analysis, the total estimated liquidation value of the debtor's assets is $2,447,074. [Debtor's proposed findings of facts at Dkt. No. 545, ¶90; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.] In order to determine the total dollar amount of the liens encumbering the debtor's assets, Ms. Barroso considered the claims filed by secured creditors and the amounts listed in schedule D. [Debtor's proposed findings of facts at Dkt. No. 545, ¶89; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.] And, after deducting from the estimated liquidation value of the debtor's assets, the estimated chapter 7 expenses, chapter 11 expenses, secured claims, priority claims, and exemptions claimed by the debtor, Ms. Barroso concluded that would be no funds available to make any distribution to the general unsecured creditors in a chapter 7 scenario. [Debtor's proposed findings of facts at Dkt. No. 545, ¶91; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Joint Exhibit VI, Dkt. No. 521-3, p.13.]

Ms. Barroso explained that the 24% discount rate she used assumed that the most likely purchaser of the gas stations would be an investor and considered the risks related to the investment being made. [Debtor's proposed findings of facts at Dkt. No. 545, ¶97; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516.]

Ms. Barroso updated the liquidation analysis for the confirmation hearing. [Exhibit E, Dkt. No. 521-4.] She kept the 24% discount rate for valuation of the intangibles, but incorporated the recent appraisal reports of the Mayaguez and Hormigueros gas stations. [Debtor's proposed findings of facts at Dkt. No. 545, ¶92; Testimony of CPA Doris Barroso on April 4, 2018, Dkt. No. 516; Exhibit E, Dkt. No. 521-4.]

USIC then called its expert witness, CPA Rafael Perez Villarini, to testify regarding his valuation reports of the two Puma leases. [Testimony of CPA Rafael Perez Villarini on April 4, 2018, Dkt. No. 516; Exhibits 5 & 6, Dkt. Nos. 521-14 & 521-15.] Mr. Perez Villarini testified that he used the income capitalization approach to value the leases. [Id.] Whereas the report admitted as Exhibit 5 includes a tabulation of the cash flow of all the payments related to the lease contracts since April 1, 2013 until the end of the 20-year lease, the tabulation in the addendum admitted as Exhibit 6 has a start date of February 1, 2018. [Id.]

Mr. Perez Villarini explained that in his valuation reports he calculated the present value of the income stream using a 13% discount rate based on the prime rate and adding additional risk factors as follows: the prevailing prime rate of 4.5% as of February 1, 2018, plus the highest additional factor over prime rate charged by Banco Popular de Puerto Rico, which is 5.25%, plus an additional risk factor of 2%, which total 12.64%, which he rounded to 13%.

[Testimony of CPA Rafael Perez Villarini on April 4, 2018, Dkt. No. 516; USIC's proposed findings of facts at Dkt. No. 546, ¶92.]

The results of the report prepared by Mr. Perez Villarini reflect that as of October 1, 2013, the value of the lease contracts for the Mayaguez and Hormigueros gas stations were $1,834,000 and $3,301,000, respectively. [Testimony of CPA Rafael Perez Villarini on April 4, 2018, Dkt. No. 516; Exhibit 5, Dkt. No. 521-14.] And, as per the addendum, the value of the lease contracts for the Mayaguez and Hormigueros gas stations as of February 1, 2018 were $1,561,000 and $2,808,000, respectively. [Testimony of CPA Rafael Perez Villarini on April 4, 2018, Dkt. No. 516; Exhibit 6, Dkt. No. 521-15.] Mr. Perez Villarini testified that he did not consider any expenses related to the lease agreements because there are no expenses for the debtor under the lease contracts. [Testimony of CPA Rafael Perez Villarini on April 4, 2018.]

On April 12, 2018, the court held a hearing related to the confirmation where it made some preliminary findings. [Dkt. Nos. 519, 524 & 537.] As mentioned before, the court explained to the parties that there was a problem with the lumping of assets and liabilities in the debtor's liquidation analysis that misstated the liquidation value of the bankruptcy estate and referred the parties to a liquidation analysis performed by attorney Wigberto Lugo Mender, who is also a chapter 7 trustee, in the case of San Juan Oil Company, Case No.15-09593 (EAG) at docket 74-4. [Hrg. Tr., Dkt. No. 537 at p. 4, lines 16-21; p. 5, lines 21-25; p.6, lines 1-4.]

The court addressed first the Mayaguez gas station and agreed with CPA Perez Villarini that the best and most likely purchaser in a chapter 7 scenario for the property would be an investor because of the recording of the Puma lease in the Registry of Property and the 15 years remaining on the lease and because a chapter 7 trustee would have to sell the property

subject to the lease as per section 365(h)(1)(A)(ii). [Hrg. Tr., Dkt. No. 537 at p. 9, lines 17-24.]
The court also agreed with CPA Perez Villarini that a chapter 7 trustee would have to pay the
secured liens at the closing of the sale. [Hrg. Tr., Dkt. No. 537 at p. 10, lines 16-19.] The court
added that the liquidation analysis needed to include, the present value of the proceeds from
the sale of the gas station at the end of the Puma lease in 2033 as an investor would need to
hold on to the property till then to collect all of the lease income. [Hrg. Tr., Dkt. No. 537 at p.
11, lines 22-25; p. 12, lines 1-9.]

The court also found credible the market values of the two gas stations stated in the
debtor's appraisal reports based on the assumption that an investor would sell the real
properties at the end of the Puma leases in 2033 as closed gas stations. [Hrg. Tr., Dkt. No. 537
at p. 12, lines 16-24; p.21, lines 2-24 .] The court added that the parties need to subtract from
the present values of the lease payments and proceeds from the sale of the two gas stations in
2033, the mortgage payoffs and all expenses associated with the same. [Hrg. Tr., Dkt. No. 537
at p. 13, lines 2-12.] The court also stated that the tax effect of the transactions and the
chapter 7 trustee's fees needed to be considered in the analyses. [Hrg. Tr., Dkt. No. 537 at p.
14, lines 2-15.]

The court requested that the present value analysis be calculated using a 16% discount
rate for both the Puma-lease income and the proceeds from the sale of the two gas stations
considering various factors which include: the fact that Puerto Rico has been in a recession
since June 2006 and that its economy continues to contract, the decline in population, and the
decline in real estate values. [Hrg. Tr., Dkt. No. 537 at p. 15, lines 21-25; p. 16, lines 1-4.] The
court also referenced the findings made by Judge Fuste in the Wal-Mart case as to the dire

20

financial condition of the Commonwealth of Puerto Rico.[4] [Hrg. Tr., Dkt. No. 537 at p. 16, lines 4-18.] The court also explained that it was also taking into account the disruptive effect of technological advances that could negatively impact the gasoline and automobile industries, the tax effect of the rental income which is subject to a high tax rate in Puerto Rico, the speculative nature of the sale of two gas stations in 2033, and the fact that the stock market long term can yield 10% or more. [Hrg. Tr., Dkt. No. 537 at p. 16-18.]

The court found that given that the debtor owns 100% of the shares of Hi-Speed, a chapter 7 trustee would most likely take control of the corporation and liquidate its assets. [Hrg. Tr., Dkt. No. 537 at p. 19, lines 22-25, p. 20, lines 1-4.] For purposes of the liquidation analyses, the parties were to assume that Hi-Speed's main asset is its gas station and its main liability is the mortgage on the gas station. [Hrg. Tr., Dkt. No. 537 at p. 33, lines 1-16.]

As reflected in the minutes of the April 12, 2018 hearing, the court ordered the following:

1. The court finds that there is a problem with the lumping of assets and liabilities in the debtor's liquidation analysis that misstates the liquidation value of the estate. The debtor is to file by April 23, 2018 a re-do of the liquidation analysis following the format in case number 15-09593, docket number 74-4.

2. The debtor is also to email to USIC the excel spreadsheet of the new liquidation analysis. The tax effect of the sale transaction, if there is one, has to be taken into account.

3. USIC is to file by April 26, 2018 its own version of the liquidation analysis, with the addendums of the present value calculations of the leases.

4. Condado 2 is ordered to provide the debtor with updated payoff amounts on its loans. The debtor will send a written request to Condado 2.

5. A transcript of this hearing for the record is hereby ordered.

---

[4] Wal- Mart Puerto Rico v. Zaragoza- Gomez, 174 F.Supp.3d 585 (D.P.R. 2016), aff'd, 834 F.3d 110 (1st Cir. P.R. 2016).

The court also made the following preliminary findings:

A. MAYAGUEZ GAS STATION:

1. The court will preliminarily accept the conclusion of CPA Perez Villarini's that the best and most likely purchaser for the property is an investor because of the fifteen (15) year lease.

2. The court accepts the conclusion of CPA Perez Villarini's that the chapter 7 trustee will have to pay the secured liens at the closing of the sale.

3. This purchase will be considered by the court as the purchase of an investment with a fifteen (15) year term.

4. The debtor is ordered to provide the court with a present value analysis of the Mayaguez gas station using a 16% discount rate. The reasons why the court asked to see the present value calculations using a 16% discount rate were stated in open court.

B. HI-SPEED:

1. Given that debtor owns 100% of the shares of Hi-Speed, the most likely chapter 7 scenario is that the trustee will take over the control of the corporation and liquidate its assets.

2. Based on the representation of counsel of the debtor to the court, the parties are to assume that Hi-Speed's only asset is the gas station and its only liability is the mortgage(s) on the gas station.

3. The same other assumptions and the same procedure for calculating the present value of the Mayaguez gas station is to be used for the present value of the Hi-Speed gas station.

[Dkt. No. 524.]

The confirmation hearing continued on April 30, 2018, where the court allowed the debtor to present, through the testimony of Ms. Barroso, the restated liquidation analysis using the 16% discount rate ordered at the April 12, 2018 hearing. [Debtor's proposed findings of facts at Dkt. No. 545, ¶111; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538.] Ms. Barroso also prepared additional alternate scenarios, considering the liquidation factors used in the case of San Juan Oil and using USIC's liquidation analysis. [Debtor's proposed

findings of facts at Dkt. No. 545, ¶111; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibits F, G & H, Dkt. Nos. 539-2, 539-3 & 539-4.]

Ms. Barroso explained that Exhibit F was a liquidation analysis prepared by her using the 16% discount rate as per the instructions of the court with the following parameters: the format used in the case of San Juan Oil; a discount rate of 16% for the present value computation of the assets (gas stations real estate and income from Puma leases); capital gain taxes in the amount of $188,000 on the sale of the Mayaguez gas station; capital gain taxes in the amount of $98,000 on the sale of Hi-Speed assets; updated loan balance for the Mayaguez gas station in the amount of $1,096,037; updated administrative expenses for chapter 11 considering the United States Trustee fees and the actual professional services approved by the court for a total amount of $107,600; chapter 7 administrative expenses including chapter 7 trustee fees, which included trustee's fees on disbursements made to secured creditors; and the deduction of claimed exemptions on the debtor's residence and households goods. [Debtor's proposed findings of facts at Dkt. No. 545, ¶112; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit F, Dkt. No. 539-2.]

Ms. Barroso testified that Exhibit F considers and maintains the debtor's original 70% liquidation factor for the real estate and a 90% liquidation factor for the intangibles (Mayaguez gas station lease and shares of Hi-Speed), instead of the 50% liquidation factor used in the case of San Juan Oil. [Debtor's proposed findings of facts at Dkt. No. 545, ¶113; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit F, Dkt. No. 539-2.] And, according to Exhibit F, the total amount available for distribution to unsecured creditors after payment of the chapter 7 expenses, chapter 11 administrative expenses, and priority creditors is $47,392.

23

[Debtor's proposed findings of facts at Dkt. No. 545, ¶114; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit F, Dkt. No. 539-2.]

Under this scenario, the total dividend to unsecured creditors in chapter 7 would be 0.5%. [Debtor's proposed findings of facts at Dkt. No. 545, ¶115; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit F, Dkt. No. 539-2.] As such, Ms. Barroso opined that under the scenario contemplated in Exhibit F, the debtor complies with the best interest test since the plan dividend to unsecured creditors is 9%, while in chapter 7 unsecured creditors would only receive 0.5%. [Debtor's proposed findings of facts at Dkt. No. 545, ¶116; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit F, Dkt. No. 539-2.]

Ms. Barroso also testified regarding an alternate scenario prepared by her (debtor's Exhibit G), which had all of the variables included in Exhibit F, but adjusted only the liquidation factor to 50% as used in the San Juan Oil case, 15-09593. [Debtor's proposed findings of facts at Dkt. No. 545, ¶119; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit G, Dkt. No. 539-3.] In Exhibit G, using that lower liquidation factor, the liquidation value of the debtor's assets was $432,185, which did not cover all of the chapter 7 administrative expenses since it yielded a negative $48,036 liquidation value prior to the payment of chapter 11 expenses and priorities. [Debtor's proposed findings of facts at Dkt. No. 545, ¶120; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit G, Dkt. No. 539-3.] Under the scenario of Exhibit G, Ms. Barroso concluded that unsecured creditors would receive no dividend. [Debtor's proposed findings of facts at Dkt. No. 545, ¶121; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit G, Dkt. No. 539-3.] Under the scenario contemplated in Exhibit G, the debtor still complies with the best interest test since the plan

24

dividend to unsecured creditors is 9%, while in chapter 7 unsecured creditors would receive no dividend. [Id.]

Ms. Barroso explained why the 13% discount rate proposed by USIC was erroneous and why the proper discount rate was a higher rate, such as the 24% rate she originally applied. [Debtor's proposed findings of facts at Dkt. No. 545, ¶122; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538.] Ms. Barroso explained the methodology and basis for achieving and applying the original 24% discount rate. [Id.] Ms. Barroso explained that the proper way to calculate a discount rate when considering an investment would be to use a "build up rate" that considers the following factors: the safe rate provided by the U.S. Treasury 20-year bonds; factors for risks including equity premiums, which are what an investor would receive if the money was placed in the market; an additional percentage for the "small size company" risk premium; and an additional specific risk factor considering the industry of the company also known as industry risk. [Debtor's proposed findings of facts at Dkt. No. 545, ¶124; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538.]

Then, as ordered by the court, USIC submitted through the testimony of Mr. Perez Villarini two liquidation scenarios: one using the 16% discount rate and an alternate scenario using the 13% discount rate. [Testimony of CPA Rafael Perez Villarini on April 30, 2018, Dkt. No. 538; Exhibit 17, Dkt. No. 539-5.] In his analyses, Mr. Perez Villarini included $15,000 for chapter 11 administrative expenses ($10,0000 for attorneys' fees and $5,000 for accounting fees) and also assumed that a chapter 7 trustee would not receive fees on payments to secured creditors and that those payments would be made by escrow agents after the closing from monies withheld in escrow. [Testimony of CPA Rafael Perez Villarini on April 30, 2018, Dkt. No.

538.] Mr. Perez Villarini also calculated the present value of the payments under the debtor's plan. [Id.]

According to Mr. Perez Villarini, the scenarios submitted by USIC show that creditors would receive more in a chapter 7 scenario than under the debtor's proposed chapter 11 plan. [Testimony of CPA Rafael Perez Villarini on April 30, 2018.] Under USIC's liquidation scenario with a 16% discount rate, the unsecured creditors would receive a dividend of 5.45% dividend, compared to a 4.84% dividend as the present value of payments to be received under the debtor's plan. [Testimony of CPA Rafael Perez Villarini on April 30, 2018, Dkt. No. 538; Exhibit 17, Dkt. No. 539-5.] And, under USIC's liquidation scenario using a 13% discount rate, the unsecured creditors would receive a 9.86% dividend, compared to a 5.16% dividend as the present value of payments to be received under the plan.

Ms. Barroso then took the stand again to rebut, with debtor's Exhibit H[5] (using the 16% discount rate requested by the court), USIC's liquidation scenario. [Debtor's proposed findings of facts at Dkt. No. 545, ¶135; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit H, Dkt. No. 539-4.] Ms. Barroso testified that in Exhibit H, she made three changes to USIC's liquidation analysis. [Debtor's proposed findings of facts at Dkt. No. 545, ¶136; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit H, Dkt. No. 539-4.] First, she applied a 90% liquidation factor to the Mayaguez gas station and its lease value instead of the 100% liquidation factor used by USIC. [Id.] Ms. Barroso explained that the application of a liquidation factor was required due to the fact that in chapter 7 case the sale of assets would be under "firesale conditions." [Id.] Second, she added the fees the chapter 7

---

[5] Admitted as rebuttal evidence under United States v. Harris, 557 F.3d 938, 942 (8th Cir. 2009).

26

trustee would receive from disbursements made to secured creditors, even if made by an escrow agent. [Id.] Third, she added the actual chapter 11 administrative expenses for legal and accounting fees already incurred as of March 31, 2018, which she got from applications for compensation approved previously by the court. [Id.] A chapter 7 trustee would have to pay these allowed chapter 11 administrative expenses prior to any distribution to unsecured creditors. [Id.]

With these three adjustments to USIC's 16% discount rate liquidation analysis and no other change to the calculations made by Mr. Perez Villarini, the dividend to unsecured creditors in a chapter 7 would be 2.9% versus the 9% distribution to unsecured creditors under the debtor's proposed plan. [Debtor's proposed findings of facts at Dkt. No. 545, ¶137; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit H, Dkt. No. 539-4.] Ms. Barroso concluded that even using the 16% discount rate and accepting as correct applying that rate to discount payments under the debtor's plan, the dividend under the plan would be 4.84% versus a 2.9% dividend in a chapter 7 liquidation . [Debtor's proposed findings of facts at Dkt. No. 545, ¶139; Testimony of CPA Doris Barroso on April 30, 2018, Dkt. No. 538; Exhibit H, Dkt. No. 539-4.]

After a break in the testimony, counsel for USIC admitted that Mr. Perez Villarini reviewed during the break Exhibit H and did not have any disagreement with Mr. Barroso's analysis in this exhibit. [Debtor's proposed findings of facts at Dkt. No. 545, ¶140; Dkt. No. 538]

### V. APPLICABLE LAW AND DISCUSSION

Confirmation of a chapter 11 plan is governed by section 1129. Section 1129(a)(7)(A) requires that each holder of an impaired claim either accept the plan or "receive or retain under

27

the plan . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. . . ." 11 U.S.C. §1129(a)(7)(A). The best interest test represents an "individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation." 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1129.02[7] (16th ed. 2018). "Applying the 'best interests' test requires the court to conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan." In re Sierra-Cal, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997). The court acknowledges that a "hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to a chapter 7." Id.

In order to comply with the best interest test, a debtor must demonstrate that the plan will provide an equal or better recovery than would be provided to dissenting creditors in a chapter 7 liquidation. See In re Genesis Health Ventures, Inc., 266 B.R. 591, 610 (Bankr. D. Del. 2001). The proponent of the chapter 11 plan has the burden to show compliance with the best interest test. Id.(citing In re American Family Enters., 256 B.R. 377, 403 (D.N.J. 2000); In re Global Ocean Carriers Ltd., 251 B.R. 31, 46 (Bankr. D.Del. 2000)).

In this case, the court finds that in a hypothetical chapter 7 liquidation it would be appropriate to apply a 16% discount rate to calculate the present value of future lease income and the proceeds from the sale of the two gas stations in 2033. The court explained at the April 12, 2018 hearing the factors it considered on deciding on the 16% discount rate as, to name a few, Puerto Rico's weak economy, the island's 12-year long recession, the uncertainty

of technological advances that could disrupt the gasoline and automobile industries, and the considerable degree of speculation implicit in forecasting many years into the future.

USIC in its liquidation analysis (Exhibit 17), applying a 16% discount rate, calculated that (1) unsecured creditors in a hypothetical chapter 7 would receive a 5.45% dividend and (2) they would receive under the plan a 4.84% dividend. Thus, USIC argues, the plan fails the best interest test.

But, the debtor's Exhibit H, admitted as rebuttal evidence to USIC's liquidation analysis showed, with three adjustments to USIC's liquidation analysis at Exhibit 17, that USIC overstated the dividend unsecured creditors would receive in chapter 7.

First, the debtor's expert, Ms. Barroso, applied a 90% liquidation factor to the Mayaguez gas station and lease values. A 90% liquidation factor is justified because assets are typically sold under fire-sale conditions in chapter 7 liquidations. A liquidation "contemplates valuation according to the depressed prices that one typically receives in distress sales." In re Sierra-Cal, 210 B.R. at 172. And, the debtor's appraiser, Mr. Ortiz del Valle, testified that the fee simple value in his reports for both gas stations were based on an exposure period of 36 months and that the values in a chapter 7 liquidation would be lower due to the faster pace of a chapter 7 sale.

Second, the debtor calculated $117,234 in section 326 fees paid to the chapter 7 trustee on all disbursements made to secured creditors from the sale of the properties subject to the trustee's administration. USIC's calculation of $56,566 in chapter 7 trustee's fees excluded disbursements made by third parties, such as an escrow agent, to secured creditors. Although the case law is split on this issue, the majority of courts favors the debtor's position on

calculating the chapter 7 trustee's fees.  "Most courts say that distribution by the escrow agent is made at the direction of the trustee and therefore is 'by the trustee' for purposes of the [326] cap." 3 Collier on Bankruptcy at ¶ 326.02[1][f][i]; see In re McMaster, 396 B.R. 266, 269 (Bankr. M.D. Pa. 2008).

The third adjustment made by Ms. Barroso was to use the actual, as of March 31, 2018, chapter 11 administrative expenses. USIC's liquidation analysis included $15,000 of chapter 11 legal and accounting fees. The debtor's liquidation analysis included $105,000 in chapter 11 legal and accounting fees, which were taken from unpaid fee applications already approved as of March 31, 2018 by the court.

The court finds that the adjustments made by the debtor's expert in Exhibit H to USIC's liquidation analysis in Exhibit 17 are warranted.  With these adjustments made to USIC's liquidation analysis at Exhibit 17,  the chapter 7 dividend to unsecured creditors alleged by USIC  falls from 5.45%  to  2.9%.  And, Ms. Barroso testified that with those adjustments, the amended plan would still pass the best interest test even if we applied the 16% discount rate and calculated the present value of payments under the debtor's plan,  to reduce the dividend from 9% to 4.84%, which is higher than 2.9%.  And, again, counsel for USIC admitted in open court that Mr. Perez Villarini reviewed Exhibit H and did not disagree with Ms. Barroso's analysis in this exhibit.

As such, the debtor has passed the best interest test of section 1129(a)(7).

**VI. CONCLUSION**

Having concluded that the debtor met his burden to establish compliance with the best interest test under section 1129(a)(7), the court confirms the debtor's amended plan as

supplemented [at Dkt. Nos. 126, 165, 222, 484, 498, 532 & 534] and denies USIC's objection to confirmation [at Dkt. No. 354.] The clerk is to enter a separate order confirming the debtor's amended plan as supplemented [at Dkt. Nos. 126, 165, 222, 484, 498, 532 & 534.]

In Ponce, Puerto Rico, this 18th day of September2018.

Edward A. Godoy
U.S. Bankruptcy Judge